## R. E. WILLIAMS V. THE STATE.

*No. 3876. Decided December 2.*

1. **Assault with Intent to Murder—Reasonable Appearances of Danger—Evidence.**—Defendant being on trial for assault with intent to murder, and it appearing from the evidence that he and C., the injured party, had had a serious previous difficulty, after which C. had made violent threats against defendant, and had borrowed a gun which he commenced carrying about with him in his hack, all of which facts had been communicated to defendant; and it further appeared at the time of the shooting that C. was in his hack and leaned over as if he was about to pick up his gun from the bottom of his hack, the theory of the defense being self-defense based upon reasonable appearance of danger, *held*, that it was permissible for the State to prove in rebuttal of this defense that C. at the time he was shot had no gun in his hack, and therefore could not have been leaning over to grasp one.

2. **Charge of the Court—Objectionable as to Form.**—See a charge of the court held to be objectionable on account of form, in that the unlearned mind of the juror might be unable to grasp, retain, and properly apply the different circumstances, conditions, and contingencies upon which the rights of defendant were predicated, all of which were contained in a single paragraph of said charge.

3. **Aggravated Assault—Charge—Reasonable Appearances of Danger—Provoking Difficulty.**—Where the court charged the jury that defendant would be justified in acting upon reasonable appearances of danger, but qualified his right to act upon such appearances of danger "if the defendant provoked the difficulty in order to have a pretext for killing Cusenberry, or doing him some serious bodily harm;" *held*, that since an intent to do "serious bodily harm" could not constitute an assault with intent to murder, said charge was erroneous and calculated to mislead, in that it did not go further and instruct the jury that if the intent was to do serious bodily harm, and not to murder, then defendant's offense would be aggravated assault, and not assault with intent to murder.

4. **Charge—Self-Defense—Retreat.**—Upon his theory of self-defense defendant requested a special instruction to cure an omission in the court's charge to the effect that he was not bound to retreat, which was refused by the court. *Held*, error. It is

a part of the statutory law of self-defense (Penal Code, article 573) that a party who is "unlawfully attacked is not bound to retreat in order to avoid the necessity of killing his assailant."

5. **Same—Insulting Conduct Toward a Female Relative—Manslaughter.** Where it was made to appear from the evidence that the assaulted party had been guilty of insulting conduct toward the wife of defendant, and that the meeting at which the shooting took place was the first meeting between the parties after such insulting conduct, *held*, error to refuse a special requested instruction submitting the law of manslaughter as applicable to this phase of the case.

6. **Expert Testimony—Opinion Evidence.**—Expert opinion evidence of medical witnesses is not admissible to prove the relative position or situation of parties involving a homicide or assault with intent to murder. It was error to permit, over defendant's objection, the testimony of a physician who, from an examination of the wound, was of the opinion that the party was sitting in an upright position when shot.

APPEAL from the District Court of Coleman. Tried below before Hon. W. J. Wingate.

Appellant was tried and convicted in the court below of an assault with intent to murder one W. P. Cusenberry, and his punishment was assessed at two years imprisonment in the penitentiary. The statement of facts is too voluminous to be given in full.

As illustrative of the nature of the case, and the questions ruled upon in the opinion, we deem it necessary only to reproduce the testimony of W. P. Cusenberry and Joe Cusenberry for the State; and the testimony of Henry Henderson, Mrs. R. E. Williams, and R. E. Williams for the defense.

In connection with this and the other testimony given, we would state that numerous threats were proved on the part of W. P. Cusenberry against the defendant, and that the evidence as to the character of Cusenberry as a peaceable and law-abiding man, or a dangerous and violent man, was conflicting. Defendant proved his character by numerous witnesses as that of a peaceable and law-abiding man. It was proved that both parties had good reputations for truth and veracity in the community in which they lived, and had maintained such reputation throughout their lives.

W. P. Cusenberry, the first witness for the State, after being duly sworn, testified: My name is W. P. Cusenberry. I reside in the western portion of Coleman County, Texas, near Talpa Station, on the Gulf, Colorado & Santa Fe Railway. I know the defendant R. E. Williams. I knew him on the 11th of July, 1890. He was at that time, and had been for some time, the telegraph operator at Talpa Station, in Coleman County. There is a depot building at Talpa Station. The building is constructed as follows: It is located on the south side of the railway track on the right of way. The railway runs east and west and through my pasture. The building is longer than it is wide. Has a waiting room in the west end. Next to the waiting room to the east

and joining it is the office where the operator stays.   Just east of this
office is another room for the freight.   There is a door on the south
side of the freight room going into it, and a door on the south side of
the waiting room near the west end of the building.   There is one win-
dow on the west end of the building.   There is also a door on the north
side of the sitting room, near the west end of the depot building, which
enters the sitting room.   There is a little ticket window between the
sitting room and the office, and a door near the southeast corner of the
sitting room and the southwest corner of the office, entering office from
the sitting room.   There is also in the north side of the building a large
bay-window made of glass, on the north side of the office.   The bay-
window projected out from the building in a circle, and extended from
the top of the building to within two or three feet of the floor.   This
portion is glass.   A party sitting on the inside could see out on the
north side through this window.   The traveled road crossing the rail-
way track passed within eighty or one hundred feet of the bay-window,
and about eighty or one hundred feet from the west end of the depot.
I live about two and one-half miles northeast of the depot.

I remember the circumstances of the defendant Williams shooting
me at Talpa Station, Coleman County, Texas, on the 11th of July, 1890.
On the morning of that day I left my house to go to a fire in the south
part of my pasture.   The fire was southwest of the depot.   There is a
traveled road from my house in the direction of the fire.   The road
crosses the railway track about eighty to one hundred feet west of the
west end of the depot building, and said road also passes along by the
north side of the depot building about eighty to one hundred feet from
the bay-window.   I traveled this road in going to the fire.   I left home
about 10 or 11 o'clock in the morning.   My little boy Joe and a man
by the name of Roberts went with me.   Roberts is dead.   We traveled
in an open hack, the bed being about ten inches in depth.   There was
nothing in the wagon but a plow, a half-barrel used as a wash-tub, and
some sacks to fight fire with.   I was in my shirt sleeves, and had no
arms of any kind.   We passed by the depot building, opening and
closing the gate on the north side of the track, and also opening and
closing a gate on the south side of the track, the right of way being
fenced.   As we passed the bay-window I saw the defendant sitting in
the office at the window reading a paper, and he looked up at us.

When we got down to the fire we found one Holt, the witness under
the rule, down there; and after fighting fire a while I got sick, and me
and my little boy got in the hack and started for home.   We returned
the same way we had gone, and went by the road going by the depot.
We drove up to the gate.   I had my head down, and my little boy Joe
started to get out to open the gate and had his foot upon the wheel.
At that time he said to me, "Mr. Williams is coming with a gun."   I

looked up, and he (Williams) was then more than half-way from the corner of the depot building to the gate, up to which we had driven, with a double-barrel shotgun in his hands. The gate was about one hundred feet southwest from the depot. He said to me, "Prepare yourself." I replied to him I had nothing to prepare myself with, and no time for preparation. He then commenced cursing me and abusing me. I sat a few moments and looked at him, and commenced turning our horses to the right to go around the curve in the fence at that place in order to go on down the fence in another direction, and said to him that he would not talk to me in that way if he did not have all the advantage of me. He replied: "You had the advantage of me the other day when you hit me with that strap, and I have got 'the drop' on you now and I am going to use it." I told him I did not see how I had the advantage of him, when he had a knife and me only a strap. At this time I had about turned the horses, throwing my back toward him, and he then shot me in the back as I looked back over my left shoulder, hitting me with two buckshot under the left shoulder blade. I fell over in the front of the hack, dropping the lines out of my hands, and my little boy Joe picked them up, struck the horses with the lines, and drove the horses away rapidly. I could see Williams following along down the right of way, and he went through the gate near the section house about a mile and a quarter east of the depot, and went home. All this occurred in Coleman County, Texas.

Some three or four weeks prior to this time myself and the defendant had a difficulty near Talpa Station and near defendant's house. I was driving some horses belonging to defendant and Henry Henderson out of the pasture. They had agreed to take them out, and I was driving them by defendant's house, when I saw him and told him that I was going to drive them out and put them in Brookshear's pasture; that I was cleaning out the pasture, and that I concluded that it would not be much trouble for me to do so. He told me that he proposed to keep some horses in that pasture all the time; and I told him that he and Henderson had agreed to take the horses out, and I didn't propose for him to keep any in there. He called me a "damn liar," and put his foot upon the wire fence and reached over the fence and made a rake at me with his knife. I struck at him with a leather strap, and he threw up his arm and the strap hit him on the arm. He turned off and went to the house, and I kept after the horses, and was driving them out, and in so doing they ran on around the defendant's house and I followed after them.

At the time of the shooting Joe was sitting on the end of the seat nearest Mr. Williams. There were no arms of any kind in the hack at the time of the shooting, and I was at that time unarmed and in my shirt sleeves. The shooting occurred about 1 or 2 o'clock in the evening, July 11, 1890.

Cross-examined: I did about a month before the shooting ask Horace Thompson, of Runnels County, to circulate a petition addressed to some officials of the Gulf, Colorado & Santa Fe Railway Company, asking the removal of Williams as station agent. This was after the first difficulty; but in the conversation I had with him I did not say that I was going to get rid of the thief if it cost me my life.

I did not state to old man Greenlee on the evening of the first difficulty out in my pasture, that I had met Williams over at the depot that evening, and that I had asked him to take his horses out of my pasture, and that he (Williams) said he would keep them there anyhow; that what he (Williams) said flew all over me, and I lashed the "thieving son of a bitch." And I did not tell old man Greenlee that I would give defendant twenty days in which to leave the county. Yes, I did meet old man Greenlee a few days before the trial, and told him that on a former trial of this case he had sworn falsely if he had stated what I heard.

I did have a conversation with Dr. Beaumont in his office a few days after the first difficulty, but I did not say that I had heard that defendant had leased a section of land in my pasture, but if I caught the defendant driving his horses across my pasture I would kill him, and I did not in that conversation abuse and curse the defendant. I do not curse and swear. I did buy some buckshot in the town of Coleman a few days after the first difficulty. I did not buy powder. I had powder at home. I did on the same day take W. D. Jayroe out from Coleman in my hack, and did get a shotgun from a man named Jones on my way home, but I did not tell Jayroe after I had got the gun that now when I met Williams (the defendant) that I would have a "walk over," looking down at my gun. I did not state to Jayroe that now I was prepared for him, and the first time I caught Williams crossing my pasture he (Williams) was "my meat."

I never told old man Bills at any time between the two difficulties that Williams and I could not live in the same county. I did not call Williams a "G—d damned son of a bitch" when I struck him with the leather strap in the first difficulty. I did not ride around Williams' house yelling like a Comanche Indian, and when Mrs. Williams came to the back door, lean over in my saddle, look her in the face, and yell at her. I did not swear at the former trial of this case that I got the gun to shoot owls and hawks with. I may have said something about my wife asking me to get a gun to shoot hawks and owls. There were two roads leading across the railway over into the south side of my pasture. One road crosses the railway about one mile east of the depot, by the section house, and then turns and runs down the railway and crosses the track as I have described.

It is not a fact that I traveled the road east of the depot most. The gates at the section house were not put in for my convenience that I

know of. I seldom used the road. I usually traveled the road by the depot. My little boy did not get out on the ground when I stopped at the gate after coming back from the fire; he only started to get out. At the time of the first difficulty I had leased my pasture to W. G. Buske. I have employed and paid Messrs. Sims & Snodgrass, attorneys at law, to assist in the prosecution of this case. Since the first trial of this case I remember talking to Bills about Jayroe's testimony. I told him that if Jayroe testified to what my lawyers said he did, he swore to a lie.

Re-examined: There were some horses belonging to Henry Henderson and Williams in my pasture, some six or seven head. They were in there for about two weeks before the first difficulty. I had seen the parties and asked them to take them out. They had promised to do so in a few days. On the day of the first difficulty I and a man named Holt were trying to drive two colts out. They were wild, and we had some difficulty with them. We drove them up to the stockpens, and I called Williams out and asked him why he had not taken them out. He replied that the railway company owned fifty acres of land in the pasture, and that he proposed to keep them in it. I told him that the company owned no land in my pasture, and that he had to take them out. He (Williams) was standing at the wire fence with one foot on the lower wire. I was on the other side, about four or five feet from the fence, on my horse. When I told him he must take them out he reached over and struck at me with his knife. I then struck at him with the leather strap, aiming to strike him over the head, but he threw up his arm and caught the blow. Williams walked off toward his house, and I and Holt then went on to drive the colts, and they ran on down by Williams' house about fifty yards from the house, and we ran on after them. I might have hallooed after the colts. I did not see Mrs. Williams at all that day. I did not look into her face and halloo like a Comanche. There was another road leading from my house in the direction of the fire, but it was about one-half mile longer than the one by the depot.

In the conversation with Dr. Beaumont in his office I stated to Dr. Beaumont that I did not know that Mrs. Williams was in the house sick at the time of the first difficulty. In that conversation I never cursed or abused the defendant, except that I said that "he was stealing my grass, and that he was a thorough scoundrel." Dr. Beaumont then told me that he was in the house at the time of the first difficulty, and about the trouble he had in keeping Williams in the house, and he told me all about how Williams acted in the house, and it was on account of what he told me that I got the gun. I did not tell old man Greenlee what counsel for defendant asked me. I did not state to old man Greenlee at that time that I had asked Williams to take his horses out of the pasture, and that he replied that he would keep them in there as long as he pleased, and that I told him he had to take them

out, and that then Williams struck at me with his knife, and that I then struck him with the leather strap. I kept the gun I got from Jones about three weeks, but returned it before the last difficulty between Williams and myself. I received a letter from Colonel J. E. McCord about a week before I was shot by Williams.

Joe Cusenberry, next witness for the State, testified: I was with my papa, Mr. W. P. Cusenberry, at the time he was shot by Mr. Williams. I went with my papa in the hack to the fire in the south part of the pasture. We went in the morning about 10 o'clock. We went the road by the depot. I saw Mr. Williams in the office at the bay-window. I think he saw us, as he seemed to be looking at us. We went on by the depot, and went to the fire. Papa got sick and we started back home, and went back the same road we came, and when we came to the gate near the depot I got up to get out to open the gate, and put my foot on the wheel of the hack to get out, and I saw Mr. Williams, defendant, with a shotgun coming toward us. I told my papa, "Yonder comes Mr. Williams with his gun," and sat down in the seat. Mr. Williams—the first thing that was said—said to papa, "Prepare yourself." Papa said he did not have anything to prepare himself with. Mr. Williams then cursed papa, and papa turned the horses to go down the fence and started off, and as papa looked back over his shoulder Mr. Williams shot him. After papa was shot he fell over in the front part of the hack, and I grabbed up the lines and drove east along the line of the fence. I looked back twice, and saw Mr. Williams running along by the inside of the fence with his gun in his hand. My papa did not have a gun or any arms in the hack, but a tub and a plow.

Cross-examined: Nobody has talked to me about what to testify in this case. My mamma and papa talked with me two or three times about it. They only asked me what I knew about it. My uncle, Rough Cusenberry, took me off to a room by ourselves and told me to tell him what I knew about the case. Papa never talked to me about the first difficulty. He was talking to my mamma one day about the first difficulty, and told me to go out of the room. I went out, and he shut the door. I don't know whether he had any buckshot or not; he had bought some birdshot, and at one time he brought home a shotgun. There was no other gun on the place. Don't know what he got the gun for. I do not know whether or not I swore at the last term of the court that papa got the gun to shoot owls with.

Henry Henderson, a witness for defendant, testified as follows: I know R. E. Williams and W. P. Cusenberry. Prior to and at the time of the difficulty defendant and myself were partners in the buying and selling of horses. Defendant had an interest in the horses, but had nothing to do with the control and management of the horses. I managed and controlled them myself. A short time before the first

difficulty I cut out some horses in the neighborhood of Talpa, and left them. Cusenberry's fence was bad, and somehow they got into his pasture. Some time before the first difficulty I had tried to get them out, but could not, as they were hard to manage. I saw Cusenberry a few days after that, and he requested me to take them out, because he had leased his pasture to Buske and had promised to get all the stray stock out. I told him that I had tried to get them out, but could not; and he said that he would in a few days bring his man Roberts and help me get them out. In a day or two I met Cusenberry again, and he told me that he had not had time to help me get the horses out, as he had been busy thrashing grain himself. We then agreed to meet some day soon after and take them out, but no particular day was set. There were two colts, a mare, and two head of horses in the pasture belonging to us. Before Williams returned from below, and after the first difficulty, I met old man I. W. Bills, a witness under the rule, at his store in Vale, near Talpa Station. In a conversation at that time with Bills he told me that Cusenberry had told him after the first difficulty that he (Cusenberry) and Williams could not live in the same county, and that he would give Williams twenty days in which to leave the county. Immediately after Williams returned I went to see him, and told him what Cusenberry had said to Bills. I told Williams that Cusenberry was a dangerous man, and cautioned him to be on his guard.

I was at Talpa depot the day that Williams shot Cusenberry. At the time the difficulty occurred I was standing in the freight room door. The depot building contained three rooms. The room on the west was a waiting room for passengers. It had a door and window on the north, two windows on the west, a door and window on the south, a door on the east leading into the office room, and a ticket window looking into the office room. The next room was the ticket office. This had a large bay-window on the north projecting out from the wall, on the south a window, and on the east a door leading into the freight room. The next was a freight room with a large door on the north and south. There was a platform that ran around the building. It was two or three feet higher at the freight room than at the rest of the building. I was standing in the door of the freight room when I saw Williams come out with his gun in his hand. There were three other parties in the freight room—the two Hepp boys and a man by the name of Lee Good. I saw Williams come out at the south side of the waiting room. When I looked up I saw Cusenberry at the gate about sixty feet west of south from the depot. His little boy Joe had got out of the hack and was standing on the ground, and started as though he was going to open the gate, but he went back and got in the hack. Williams walked out about half-way between the platform and the gate. I was standing on the platform, which was five or six feet high. Williams was standing to the right of a line drawn from me to Cusenberry, and

about half-distance between me and Cusenberry, and Cusenberry was sitting on the seat of his hack with his little boy on his left, nearly but not quite fronting Williams. The first thing that I remember said was when Williams said, "Prepare yourself. Get your gun." I heard Cusenberry say something, but could not tell what it was. Williams said, "I know you have got a gun. I heard that you were carrying a gun for me, and you had better get it." At this time Cusenberry turned his horses facing east, until the wagon was about on a lock. This put the boy almost between Williams and Cusenberry. He then gave the boy the lines, or the boy took the lines, and he (Cusenberry) turned himself half-way around in the seat and reached over as if to pick up something from the bottom of the hack. Just at this time Williams fired. Cusenberry then straightened up in his seat, reached over and took hold of the lines in front of the boy's hands, gave the horses a slap with them, got down in the front part of the wagon, and he and the boy drove off, he having his hat in his hand waving it at the horses or striking them with it. Williams did not follow after Cusenberry. He may have moved two or three feet from where he stood, but not more. Williams could have shot Cusenberry before he did if he had wanted to. He could have shot him again if he wanted to after he did shoot him. I do not remember exactly the words that were spoken, but what I have stated is the substance of what was said to the best of my recollection.

I saw the fire in Cusenberry's pasture that day, and know where it was located. It was a little west of south from the depot. The depot was not on a line from Cusenberry's house to the fire. There was a road leading from Cusenberry's house to the fire that was from a half to three-quarters of a mile nearer to the fire than the one by the depot. That road ran by the section house, and had four gates, and the one by the depot had five gates. Cusenberry nearly always traveled the road going by the section house going down into his pasture. Cusenberry lived about three miles northeast from the depot. At the time of the shooting defendant was station agent at Talpa, and was on the Gulf, Colorado & Santa Fe Railway Company's right of way when he fired the shot. The bed of the hack in which Cusenberry was is about ten inches high.

Cross-examined: I did not tell Squire W. T. Reese the night after the shooting, in the forks of the road between Vale and Glen Cove, that I did not see the difficulty; that I was too "chicken-hearted" to see a man shot down that way. I was there on the platform, and saw the shooting. At the time Cusenberry started the horses off after the shooting he had to turn the hack a little to go around the curve in the fence. I did not hear what Cusenberry said just before the shooting. He was further from me than Williams was. I am a warm friend of Williams. I was sleeping at the depot, and boarded at Greenlee's. Williams usu-

ally kept his shotgun at the depot. He had no particular place to keep it in the depot. I did not see Cusenberry pass the depot that morning. I left the depot soon in the morning and did not return until noon. Williams did not shoot directly over the horses, but at the time of the shooting the horses were turned so as to throw the wagon on a lock, and Williams fired between the rear part of the horses and the front of the hack, and in front of the boy.

Re-examined: I did tell Reese that the Hepp boys were there at the time of the shooting, and that I did not think that they saw any of the difficulty, as they were back in the freight room.

Mrs. R. E. Williams, for defendant, testified as follows: I am the wife of defendant. We formerly resided at Talpa Station, in Coleman County, Texas, but we now reside at Goldthwaite. We moved there about three weeks ago. My husband is station agent at that place. I remember the time of the first difficulty between my husband and Mr. Cusenberry. I was sick in bed at the time, and Dr. Beaumont was attending upon me. My husband came in, and I saw that something was wrong. He said that Cusenberry had struck him with a leather strap, and had cursed him. Dr. Beaumont stopped him when he tried to get a pistol. Hearing a noise outside of some one yelling, I went into the back room and opened the door. Cusenberry came riding by in about forty or fifty feet of where I was, when he saw me. He bent over in his saddle toward me, looked me straight in the face, and yelled like a Comanche Indian. His face looked like a demon's, and showed anger. He was not running after any horses at the time he yelled at me. There was a horse running about two hundred or three hundred yards off, but he was not yelling at it. He yelled at me. The other man was following the horse. After everything had quieted down and Cusenberry had gone off, I told my husband about the way Cusenberry had insulted me. I never saw Cusenberry again until after the shooting. I did not tell my husband about Cusenberry's conduct until after Cusenberry was gone. He (my husband) was in a different room from me at the time.

Cross-examined: My health at that time was as bad as it well could be. The stockpens are across the railway about one hundred and fifty feet from the house, but Cusenberry was not there. He was back by our lot. I have frequently heard cowboys hallooing at the cattle while loading them on the cars at the stockpens, but I never heard them utter such a terrible yell as Mr. Cusenberry uttered on that occasion. I am sensitive to noise, and sensitive to insult, too. Dr. Beaumont, when my husband came in to get his pistol, caught him by the arm and talked to him and persuaded him not to go out. I went to the back door, because I heard yelling and wanted to see what Cusenberry was doing. I know that he saw me, because he looked at me straight in the eyes and leaned over toward me in his saddle and

screamed like a maniac. I understood it was an insult intended directly for me. When Mr. Cusenberry was hallooing around the house he did not use any indecent or vulgar language, and did not in any manner expose his person. He only leaned over in his saddle and looked straight at me and yelled a hideous yell of defiance, like a Comanche Indian.

R. E. Williams, in his own behalf, testified as follows: I am now residing at Goldthwaite, Texas. I am station agent there. I have been living there about three weeks. I formerly lived at Talpa Station, in Coleman County, Texas. I was station agent there for about four years. I was station agent there on the 11th day of July, 1890. I know W. P. Cusenberry. About the 20th day of June, 1890, I met Cusenberry and a man named Holt. They were out from the depot by a wire fence, on their horses. Cusenberry called to me and I walked up to the wire fence. Cusenberry spoke to me about some horses of mine and Henderson's, and requested me to take them out of his pasture, and asked me why I had not taken them out, and I told him that I had nothing to do with the horses, that Henry Henderson had control of them, and for him to see Henderson. I told him, further, that I had a horse staked on the right of way and a sow in there, and that I had a right to keep them there, as the company had fifty acres of land in his pasture. He replied: "You have got to take them out of here, you damned thieving son of a bitch." Then he (Cusenberry) struck at me with a leather strap, aiming to strike me on the head, but I threw up my arms and caught the blow on my arm. I was standing with my foot on the second wire of the fence when he struck me. The wire came loose and let my foot down, and I turned and walked off to my house. I went into the house and got my pistol and tried to come back, but Dr. Beaumont would not let me. He caught me by the arm and told me not to go out there, as there were two to my one. I heard Cusenberry yelling around the house after I went in. That same evening my wife told me about his yelling at her. That same evening Mr. J. S. Greenlee came to me and told me that Cusenberry had told him that he (Cusenberry) had asked me to take the horses out and that I refused, and that he had "lashed the thieving son of a bitch," and that he (Cusenberry) had said "that he would give me twenty days to leave the county." Dr. Beaumont was at the time of the first difficulty at my house to see my wife. She was sick, and he advised me to take my wife to Dr. Herff at San Antonio, and a few days later I did so. I was gone about ten days. When I returned I got off at Coleman City, and next morning I saw and talked to Dr. Beaumont, and he told me that Cusenberry had been in his office a day or so before and had abused and cursed me, and said if he caught the thieving scoundrel (meaning me) driving stock across his pasture he would kill me; and Dr. Beaumont told me I had better be on my guard, as he thought Cusenberry intended to kill me. He advised me to let the

land go back to McCord & Lindsey.   I went out to Talpa that day and saw Henry Henderson.   He told me that I. W. Bills had told him that Cusenberry a few days after the first difficulty had told him (Bills) that he (Cusenberry) and I could not live in the same county, and that he (Cusenberry) would give me twenty days to leave the county.   The next day I went over to see Bills, and he told me the same thing, and I asked him (Bills) if he inferred from that that Cusenberry intended to kill me, and he said yes.   A few days later Jayroe came and told me about Cusenberry getting a gun, and that Cusenberry had told him (Jayroe) "that he was prepared for me, and that as soon as I got back he would have a walk over."   Jayroe also told me that Cusenberry had said that if he ever caught me crossing his pasture I was "his meat," and that he could tell me more, but he thought that was enough to put me on my guard, and that he thought that Cusenberry intended to kill me.

On the morning before the shooting I was in my office in the depot. I did not see Cusenberry pass the depot, but saw some one who looked like him in his hack about three hundred or four hundred yards from the depot, whom I took to be him, traveling the road that led from the depot or that passed by the depot.   About 2 o'clock in the evening I saw Cusenberry coming from the southwest toward the depot, and just before Cusenberry got to the gate I picked up my gun that was sitting near the door and started out to where Cusenberry was, just as he drove up to the gate, and the boy got out of the hack to open the gate. The boy saw me, and got back into the hack.   The horses' heads were then pointing nearly north.   Cusenberry was on the right hand side of the front seat, and the little boy Joe was sitting on the left hand side, between me and his father.   I was about fifty feet from Cusenberry, on the dump of the railway right of way.   I said to Cusenberry, "I understand that you have bought a gun and are carrying it for me."   Cusenberry replied, "I did not say it, and I have got no gun." I told him that he did have a gun, that I had heard he had it, and that he had better get it.   At this time Cusenberry turned his horses and hack around facing southeast.   As he turned the hack he gave the boy the lines and turned his body around in the seat and bent over as if to get a gun from the bottom of his hack.   At this time I shot Cusenberry. I thought he was getting his gun, and thought he intended to kill me. He straightened up, reached over and caught hold of the lines in front of his boy's hands, slipped down in the front part of his hack, waving his hat at the horses as he drove off.   The gate up at the section house was put there for Cusenberry's convenience, and that was the road that he traveled in going from his house to the south part of his pasture. The railway is built through his pasture, the depot is built in the pasture, and the right of way is fenced through his pasture.   I had been informed that Cusenberry was a dangerous and violent man, and thought he would kill me the first time we met.   I could have shot him before

I did, and could have shot him again after I did shoot him, but I did not try to shoot him again.   After Cusenberry was shot his little boy drove on off east, and I saw him no more at that time.   I did not follow nor run along the fence after him.   It was about 2 o'clock in the afternoon when the shooting took place.   The sheriff came out to Talpa that night about 2 o'clock and brought me on to Coleman.   I did not attempt nor try to escape.   The time I shot Cusenberry was the first time I had met him after my wife informed me of his conduct in yelling at her.   Dr. Beaumont was in McCord's office when we had the conversation about turning back the land, and heard all that was said.   My object in going out to meet Cusenberry was to get an explanation from him about his conduct toward my wife and myself.   When I shot Cusenberry I thought he was getting a gun to shoot me.

Cross-examined:  At the time of the first difficulty with Cusenberry, when I went into the house I got my pistol, and Dr. Beaumont held me and would not let me go out.   I intended to go out with my pistol and resent the insult that Cusenberry had given me and make him apologize for his treatment of me.   This was my intention in getting the pistol.   I heard Cusenberry yelling around my house while I was in the house.   I did not see him.   He used no vulgar or obscene language.   The road Cusenberry traveled the morning of the shooting was a traveled road.   He seldom traveled that road.   I do not remember where I was the morning of the shooting, but think I was at the depot.   My house was some seventy-five yards from the depot.   I never saw Cusenberry until after he had passed the depot and was some three or four hundred yards off, going in the direction of the fire.   He was in his shirt sleeves, and riding in an open hack.   When Cusenberry came back he was also in his shirt sleeves.   I saw him through the door of the office and the door of the sitting-room, coming up the road, and I picked up my gun and went out of the south door of the sitting room.   My gun was leaning up against the door facing in the office nearly all the time.   After going out the door I went in the direction of Cusenberry until I was within about fifty feet of him.   The first thing I said to him was, "I understand that you have been threatening to kill me, and that you have bought a gun, and that you have been carrying it for me."  Cusenberry said that he had not said so, and that he had no gun.   I told him that he did have a gun, and he had better get it.   At this time Cusenberry began turning his horses and hack, facing them around to the southeast, and about the time they were turned so as to lock the wheels I shot him, just as he leaned over as if to get something out of the bottom of the hack.   Cusenberry was in his shirt sleeves.   I knew he had passed the depot that morning, and that he had made no effort to enter the depot where I was.   I shot him because he had threatened my life and yelled around my house.   At the time I shot him he was sitting on the right side of the seat, and his

little boy Joe on the left side of the seat.   Joe, at the time I shot, was sitting on the front edge of the seat.   If he had been sitting back in the seat he would have been between me and his father.   The seat was about twelve or fifteen inches wide.   I intended when I went out to meet Cusenberry that if he attempted to shoot me to shoot him.   When Cusenberry came up to the gate from the south my gun was leaning against the inside facing of the door.   I kept my gun at the depot nearly all the time.   As agent for the company, I have had some disputes with shippers.   I had no difficulty with a section boss in which I threatened to use a Winchester on him.   At the time of the shooting the side of the hack was toward me.   That put the boy nearly on a line between Cusenberry and I.   The boy was sitting on the front edge of the seat and Cusenberry was sitting back in the seat.   If the boy had been sitting full in the seat he would have been between us.

Re-examined:   The reason that I had a difficulty with the section boss was, that I learned through the section hands that the section boss was "dead-heading" freight for Cusenberry by the wagonload, and I reported it to the company and had him "fired," and he run on to me about it.

*H. C. Randolph, J. P. Ledbetter,* and *J. C. Randolph* filed an able and elaborate brief, in which they presented substantially the following points:

1.   The court erred in permitting the witness Cusenberry to state, that at the time W. P. Cusenberry was shot he had no gun or firearm in his hack or on his person, because such testimony was immaterial, and such fact, if a fact, was unknown to defendant.

2.   The court erred in permitting Dr. Alexander to state, that in his opinion Cusenberry must have been "in somewhat of an upright position when shot by defendant."   Citing Cooper v. The State, 23 Texas, 331; Steagald v. The State, 24 Texas Ct. App., 207; Hunt v. The State, 9 Texas Ct. App., 166; Campbell v. The State, 10 Texas Ct. App., 560; Lumbkin v. The State, 12 Texas Ct. App., 341.

3.   The court erred in permitting the witness Joe Cusenberry to testify, because said witness on his examination was shown to be incompetent on account of age and lack of intelligence, and because he did not understand the nature of an oath.   This witness had testified that he was 8 or 9 years old at the time of the occurrence.   In answer to interrogatories as to what would be done with him if he testified falsely, he replied, that "the bad man" would get him.   Citing Code Crim. Proc., art. 730; Holst v. The State, 23 Texas Ct. App., 1; 58 Am. Rep., 245; 35 Am. Rep., 4.

4.   The court erred in telling the witness Joe Cusenberry, after he had shown himself incompetent to testify, and in the presence of the jury, that if he swore falsely he would go to the penitentiary.

5.   The court erred in allowing the witness W. P. Cusenberry, after
he had denied a statement made by him to one Greenlee, to state,
over objection of defendant, what he had said to Greenlee, and in this
connection the court erred in remarking in the hearing of the jury that
said witness "had the right to put himself right before the jury." Citing
Code Crim. Proc., art. 729; Copeney v. The State, 10 Texas Ct. App.,
473; Moncallo v. The State, 12 Texas Ct. App., 171.

6.   The court erred in excluding evidence offered by defendant, that
at a meeting of the pasturemen of Coleman County, in 1884, W. P.
Cusenberry, the assaulted party, proposed to go with a mob and
hang the men in Coleman County whom he suspected of cutting fences.
This evidence was offered in rebuttal of the proof of the general repu-
tation of Cusenberry as a peaceable man, but was excluded by the
court, because irrelevant.

As to errors in the charge of the court, it was objected:

1.   That it did not affirmatively and plainly instruct the jury as to
the law of self-defense applicable to threats and acts done by Cusen-
berry at the time of the shooting manifesting an intention to execute
the threats.   Citing Williams v. The State, 7 Texas Ct. App., 396; Reed
v. The State, 11 Texas Ct. App., 509; Green v. The State, 12 Texas Ct.
App., 445; King v. The State, 13 Texas Ct. App., 277.

2.   That the court erred by attempting in one sentence to instruct
the jury as to the law of communicated threats, appearances of danger,
and the provoking of the difficulty.   The result was confusion.   Citing
Jordan v. The State, 11 Texas Ct. App., 447; Gonzales v. The State, 28
Texas Ct. App., 125.

3.   On the question that it is immaterial whether the charge in-
fluenced the jury, it being excepted to:   Code Crim. Proc., art. 685;
Niland v. The State, 19 Texas Ct. App., 174; Bravo v. The State, 20
Texas Ct. App., 189; Hunnicutt v. The State, 20 Texas Ct. App., 632;
Paulin v. The State, 21 Texas Ct. App., 448.

4.   That the charge was erroneous.   King v. The State, 13 Texas Ct.
App., 284; Harrell v. The State, 13 Texas Ct. App., 377; Gonzales v.
The State, 28 Texas Ct. App., 131.

5.   Appellant requested the court to charge the law of aggravated
assault, and also, in substance, if the assault was ·committed for any
other purpose than to murder, the jury could not find defendant guilty
for an assault with intent to murder.

6.   And last, objection to the court's charge is founded on that por-
tion of it wherein the jury are in effect instructed, that though they
may not believe the appellant provoked the difficulty, yet his right to
acquittal depends on the question as to whether they believe he acted
upon reasonable apprehension of danger, and not on their belief on
reasonable doubt that he did not act on reasonable appearances of dan-
ger.   Jones v. The State, 13 Texas Ct. App., 14.

As to refusal of defendant's special requested instructions with reference to the reputation of Cusenberry as a violent man:   Lee v. The State, 2 Texas Ct. App., 339; 54 Am. Rep., 485.

As to defendant's right to act without retreating:   Arto v. The State, 19 Texas Ct. App., 126; Bell v. The State, 17 Texas Ct. App., 538; White v. The State, 23 Texas Ct. App., 154.

Upon refusal of the court to give defendant's special requested instruction applicable to an assault committed under the influence of sudden pasion arising from an adequate cause, they cited Bracken v. The State, 29 Texas Ct. App., 362; Wadlington v. The State, 19 Texas Ct. App., 266; Miles v. The State, 18 Texas Ct. App., 169, 170.

As to the necessity of giving a charge, though but slight evidence raises the issue:   Halbert v. The State, 3 Texas Ct. App., 661.

As to the duty of the court to give a special charge though it does not present the law fully:   White v. The State, 10 Texas Ct. App., 381; Bell v. The State, 17 Texas Ct. App., 538.

No brief for the State.

WHITE, PRESIDING JUDGE.—This is an appeal from a judgment of conviction for an assault with intent to murder.

We do not propose to discuss all the many questions presented in the voluminous record before us, but will content ourselves with disposing of those only which in our opinion present error in themselves, or are liable to afford matter for discussion on another trial of this cause; and the questions which we do not discuss will be those which, in the view we take of them, do not present radical or material error.

With regard to questions as to evidence, it appears that the court, over objection of defendant, permitted the witnesses Joe Cusenberry and W. P. Cusenberry to testify that said W. P. Cusenberry was unarmed and had no gun in his hack at the time he was shot by defendant.   One objection to the testimony of Joe Cusenberry was, that he was incompetent on account of his age and lack of intelligence, and consequently could not understand the nature of an oath.   We are of opinion that the witness was not incompetent, as shown by the record, and the court did not abuse its discretion in holding him competent after having fully inquired into the matter by proper examination.

As to the objection that both witnesses were allowed to testify that the defendant was unarmed and had no gun in his hack, in order to show the pertinency of the objection, or rather the pertinency of the evidence, we will state that it is abundantly established by other testimony that the parties had had a previous serious difficulty, and that the prosecutor, W. P. Cusenberry, had made violent threats against defendant, had borrowed or procured a gun some time previous to the shooting which is the subject matter of this prosecution,

which gun he had been in the habit of carrying about with him in his hack, and that this fact had been communicated to and was well known by defendant. Testifying to the facts immediately attending the shooting, defendant and Henderson, a witness for the defense, both stated that after the defendant hailed Cusenberry, who was in his hack at .the time, Cusenberry turned round and leaned over in his hack, as though about to get his gun; and the theory of the defense was that the defendant shot him at that time, and was justifiable in doing so upon the ground of reasonable appearances of danger to his life or serious bodily injury to his person. It is contended that to permit the two Cusenberry witnesses to testify that at that particular time Cusenberry did not in fact have a gun in his hack was inadmissible, because the fact that he did not have a gun was not known to the defendant, and such evidence deprived him necessarily, in the minds of the jury, of his defense, so far as his actions were based upon reasonable appearances of danger. We think the evidence was admissible, because, while the defense was that Cusenberry was leaning over at the time he was shot, as though he was about to grasp a gun in the hack, the theory of the prosecution, on the other hand, was that he was not leaning over at that time, and could not have been leaning over, as stated by the defendant, for the purpose of grasping his gun, because he had no gun in the hack at the time. We think the evidence was admissible in support of the theory of the prosecution that he was not leaning over at the time for the purpose of grasping a gun.

One of the grounds most earnestly and strenuously insisted upon as error is supposed defects in the charge of the court relative to communicated threats, and self-defense as growing out of such threats. The specific charge objected to is as follows: "You are further instructed, that if you find from the evidence that prior to the time of the alleged assault the said W P. Cusenberry had threatened the life of the defendant, or had threatened to do him some serious bodily harm, and these threats had been communicated to the defendant, such threats of themselves would afford no justification of the offense, unless it be shown that at the time of the alleged assault the said W. P. Cusenberry had done or was in the act of doing some act, or was making some demonstration manifesting an intention then and there to execute or carry out such threats, or which was reasonably calculated, in view of all the evidence and circumstances of the case, viewed and considered from defendant's standpoint, to produce, and did produce, in the mind of defendant the belief that the said W. P. Cusenberry was about to execute such threats, in which event the defendant would have the right to act upon such reasonable appearance of danger as it appeared to him at the time of the shooting, and viewed in the light of all the facts known to him at the time of the shooting, notwithstanding such danger might not in fact have been real, and the shooting, under such cir-

cumstances would be justifiable; and if you find the facts so to be you will render a verdict of not guilty, and acquit the defendant, unless you should further believe from the evidence beyond a reasonable doubt that the defendant provoked the difficulty with said W. P. Cusenberry, at the time of said assault, in order to have a pretext for killing said Cusenberry or doing him some serious bodily harm, and that the defendant did in fact provoke said difficulty with said Cusenberry with such intent, in which event, if you so believe from the evidence beyond a reasonable doubt, the defendant under such circumstances would not have the right to act upon the appearance of danger."

Appellant excepted to this charge for seven different reasons stated in his bill of exceptions. We are of opinion that the charge is objectionable more as to matter of form than substance. It is all contained in a single sentence or paragraph, and is objectionable in that the unlearned mind of the juror might be unable to grasp, retain, and properly apply the different circumstances, conditions, and contingencies upon which the rights of the defendant were predicated. We see no serious objection which can legally be urged to that portion of the charge setting forth the circumstances under which the jury would be justifiable in rendering a verdict of not guilty and acquitting the defendant.

We are not so sure as to the concluding portion of the charge, which justified it in the contingency that "if the defendant provoked the difficulty in order to have a pretext of killing Cusenberry or doing him some serious bodily harm," in which event the jury was instructed that the defendant under such circumstances would not have the right to act upon the appearance of danger. It seems to us that this portion of the charge did not present all the law of that aspect of the case. While it might be true that under such circumstances defendant would not have the right to act upon the appearance of danger, yet if he provoked the difficulty with Cusenberry in order to have a pretext, not for killing Cusenberry, but for the purpose of "doing him serious bodily harm" only, then, and in that event, he would not be guilty of an assault with intent to murder, because in the crime of assault with intent to murder the specific intent to kill is an essential element; and with any other intent short of that, or if the intent be simply to do him some serious bodily harm, and not kill him, the crime would not be assault with intent to murder, but would only amount to aggravated assault.

If the court deemed it necessary, under the circumstances of this case, to qualify the defendant's right to act upon reasonable appearances of danger, and make his act depend, as seems to have been done, upon a pretext for doing some "serious bodily harm," then he should, in addition to his charge as given, have submitted the issue of aggravated assault, which was not done. It is true, a previous paragraph of the charge instructed the jury that in order to find the defendant guilty of

an assault with intent to murder they must believe he had the specific intent to kill.   This fact, however, could not cure the omission in the charge quoted which we have pointed out.   On the other hand, it was directly in conflict with the charge in question, in which the court limits defendant's right of self-defense from appearances of danger to an assault committed in a difficulty provoked by him in order that he might have a pretext for doing him "some serious bodily harm," which could not constitute assault with intent to murder.

An error of omission is also clearly apparent in the charge of the court in reference to the law of self-defense.   It nowhere instructs the jury that defendant was not bound to retreat.   A special requested instruction embracing this phase of the law was asked by the defendant and refused by the court.   The rule is well settled that "the defendant, if unlawfully attacked by the deceased, is not bound to retreat in order to avoid the necessity of killing his assailant.   It is a part of the law of self-defense; and failure to so instruct the jury, when the facts in the evidence require the instruction, is material error, notwithstanding the failure of the defendant to except to the omission."   Arto v. The State, 19 Texas Ct. App., 126; Penal Code, art. 573; Pierce v. The State, 21 Texas Ct. App., 540; Parker v. The State, 22 Texas Ct. App., 105; May v. The State, 23 Texas Ct. App., 146.

We are further of opinion that the court should, under the circumstances developed by the evidence, have instructed the jury, as was requested by defendant's counsel, upon the law of manslaughter as applicable to insulting conduct toward the wife of the defendant.   It is made to appear that the parties had not met, or rather that this was the first meeting of the parties after the alleged insulting conduct of Cusenberry.

Defendant's fifth bill of exceptions was reserved to certain testimony given by Dr. Alexander over defendant's objection.   It will be remembered that defendant's theory of the case was, that at the time he shot Cusenberry the latter had leaned over, or was leaning over, in his hack, apparently with the intention of getting his gun.   The witness Alexander testified, that he was called professionally to see the injured party, Cusenberry, the night he was shot, and that he made an examination of his wounds.   He was permitted to state, that "from the appearance of the wounds I should judge that at the time Cusenberry was shot he was in somewhat of an upright position.   *   *   *   From an examination of the wounds I am of opinion that he must have been in an upright position at the time the bullets entered the body."   The opinion of this witness went to show that the theory of the defendant was not true.   It "touched the most sensitive nerve of the defense.   It was equivalent to an opinion on the question of his guilt or innocence." "Where the jurors are as competent as any other persons to deduce the proper conclusions from a given state of facts, the opinions even of

scientific witnesses are not admissible in evidence as to conclusions of inference to be drawn from them." Cooper v. The State, 23 Texas, 331. Expert opinion evidence of medical witnesses is not admissible to prove the relative positions and situations of parties involved in a homicide or an assault with intent to murder. See a full discussion of this subject, with authorities cited, in Thompson v. The State, *ante*, 325.

For the errors pointed out and discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Judges all present and concurring.