## GREEN BALTRIP v. THE STATE.

*No. 3784.   Decided December 19.*

1. **Murder—Implied Malice—Charge of Court.**—Where, on a trial for murder, the court charged the jury, "Implied malice is that which the law infers from or imputes to certain acts; thus, when the fact of an unlawful killing is established, and there are no circumstances in evidence which tend to establish the existence of express malice, nor which tend to mitigate, excuse, or justify the act, then the law implies malice, and the offense is murder in the first degree," *held*, the charge is clearly erroneous, as a killing on implied malice is only murder in the second degree.

2. **Manslaughter—Charge of Court.**—Where it appeared from the evidence that on the afternoon of the day of the killing (which killing was early in the night) deceased had assaulted, abused, and maltreated defendant most outrageously, to which defendant offered no resistance, and that defendant, who had armed himself, as he said, for his protection, while going along his usual route to his supper met deceased, who again began to abuse and threaten him, at the same time making demonstrations as though to draw a weapon, at which defendant shot and killed him, *held*, that the court should have submitted in his charge the law of manslaughter as applicable to these facts.

3. **Self-Defense—Reasonable Appearances—Retreat—Charge of Court.**—Where, upon the subject of self-defense, the court instructed the jury, "That the killing would not be justifiable by self-defense if the apprehended danger of serious bodily harm or death could have been prevented by the use of less violence than taking the life of deceased," *held*, erroneous, because when the accused acts under such apprehended danger he is neither bound to retreat nor resort to other means of averting the danger, but may slay his adversary if the danger be imminent and pressing, or if it reasonably appear so to him.

APPEAL from the District Court of Tyler.   Tried below before Hon. Robt. A. Greer, Special Judge.

On an indictment charging appellant with the murder of one Ed Phillips, he was found guilty of murder in the first degree, with punishment assessed at imprisonment for life in the State penitentiary.

The opinion of the court states all the material facts adduced in evidence on the trial.

*West & Chester*, for appellant.

No brief on file for the State.

HURT, JUDGE.—The defendant stands convicted of murder of the first degree, with the punishment fixed at confinement in the penitentiary for life.

The facts attending the homicide are as follows:   Millie Anderson, a witness for the State, testified, that she was standing in her house, looking out at a window, and saw deceased and defendant about half-way between her house and Harriet Black's.   She heard defendant say to deceased, "Ed, you treated me wrong to-day."   Deceased replied,

"I know I did, and I beg your pardon, and take it all back." Then defendant shot him with a gun. According to her testimony, this witness was naked, and was going to take a bath. It was about 9 o'clock at night. The moon was shining bright. She heard no loud talking prior to the killing.

On cross-examination, she said she did not tell Virgil Barnes at a certain time and place that she was naked in a bath tub at the time the gun was fired, and did not know anything about the difficulty until after the gun was fired.

Harriet Black, a witness for the State, corroborated Millie Anderson.

Frank Mathews, a witness for the State, testified, that about five minutes before the gun was fired he heard deceased cursing in a loud voice.

Virgil Barnes, a witness for the State, testified, that witness, deceased, and others were gathered in a commissary on the evening prior to the homicide at night. As a woman handed a 10-cent mill check to defendant, deceased snatched it away from him. A moment later deceased had a beer bottle, and approached defendant, and rubbed the bottle in his face and over his head repeatedly, and cursed and abused him. A few moments later deceased had his hand in defendant's collar, with a large knife drawn in a striking position over defendant's shoulder. Deceased was cursing defendant, and swore that he would kill defendant if defendant did not treat him right. The witness, by the aid of others, got deceased away. A few moments later, while defendant and others were talking, deceased interrupted them, began again to curse and abuse defendant, and said that he would kill defendant if he did not treat him right, calling him the most horrible of all epithets. Deceased then caught defendant by the back of his neck, and butted him on the head severely two or three times. The witness and others then got deceased away, and an officer arrested him and carried him away. Deceased was a very large, stout man, much stronger than defendant. Defendant made no resistance, but begged to be let alone. Defendant had no weapon, and seemed afraid of deceased. When the officer carried deceased away defendant had gone home.

The witness and others went to defendant's house and found him there alone. The house was dark. He promised to go to bed, but wanted his supper. The witness told him to go and get his supper, and return and go to bed. Defendant said he would do so. Defendant is a single man, and took his meals at Scott's house, about seventy-five yards from his own. It was about twenty or thirty minutes after the witness left defendant's house when the gun fired. Deceased was killed by the side of the trail leading from defendant's house to Scott's house. The homicide occurred just a few minutes before 9 o'clock.

This witness further testified, that the witness Millie Anderson told him that she was naked and in a tub of water taking a bath at the time the gun fired, and that she did not know anything about the difficulty until after the gun fired. Other witnesses corroborate this witness as to the occurrence in the afternoon.

One witness testified, that when deceased was jerked away from defendant, and told to behave, he beat himself on the forehead with his open knife, and said: "I have been to the penitentiary once, and I will kill that G—d damned son of a bitch [pointing to defendant], and go there again."

W. C. Weatherly, a witness for defendant, testified, that some time after dark he went to a drug store, and waited a while there for the druggist, and then went out to search for a loose horse. He met deceased in the trail. Deceased said he was going to kill defendant before daylight. A few minutes after this, witness passed defendant on the road. The conversation between deceased and the witness occurred near the point where the former was killed, about forty or fifty yards from defendant's house. The witness found his horse grazing about sixty yards from where he left deceased. Before he got to the horse he heard deceased cursing and abusing defendant in a violent manner, and by the time he got to the horse the gun fired. Deceased continued to curse and abuse defendant severely up to the instant the gun fired.

The defendant testified in his own behalf. After having tried in vain to borrow a pistol, defendant got into the house of Virgil Barnes through the window, and secured a Winchester rifle. After Barnes and the crowd had left defendant's house, defendant closed his house, took the gun, and started to Scott's for supper. He says he took the gun to protect himself "if Ed Phillips should run on me. When I got nearly to where a trail crossed the one I was traveling, I saw some one coming toward me. When he got within about ten steps of me he stopped, and I stopped. I asked, 'Is that you, Ed?' to which he made no reply. He then started as if to pass by me, and started on down the trail toward Scott's house, and just as he passed a little by me he stopped and turned around me, and I stopped and turned around, and deceased threw his hand behind him as if to draw a pistol. Up to this time I had the gun down by my side, and don't think deceased saw it until I turned around facing him. Deceased did not draw any weapon at this time that I saw. I then said, 'Ed, you have treated me very wrong to-day, by running over and abusing me, and calling me a * * * I think you ought to take it back.' Deceased immediately replied, and at the same time throwing his hand behind him in a threatening manner as if to draw a pistol, 'No, G—d damn you; I will not take it back. You G—d damned son of a bitch, I will'— and just at this interval I shot him. Virgil Barnes did not know I got

his gun.   Deceased was a larger, stouter man than I am.   I was afraid of him when he was drinking."

There was testimony that defendant's reputation was good in the community as a peaceable and law-abiding citizen, and that deceased was drinking on the day of the homicide.

The learned special judge gave in charge to the jury the issues of murder of the first and of the second degree and self-defense.   Having defined malice, malice aforethought, and express malice, the court proceeds in the seventh paragraph of his charge as follows: "Implied malice is that which the law infers from or imputes to certain acts. Thus, when the fact of an unlawful killing is established, and there are no circumstances in evidence which tend to establish the existence of express malice, nor which tend to mitigate, excuse, or justify the act, then the law implies malice, and the offense is murder in the first degree."   This is clearly erroneous, as a killing upon implied malice is murder of the second degree.

The court did not charge upon manslaughter; and whether, under the evidence, that issue should have been submitted to the jury, is the important and controlling question in this case.   In the case of Neyland v. The State, 13 Texas Court of Appeals, 549, this court said: "If, on account of these actions of deceased [referring to the acts at the time and place of the homicide], taken in connection with his previous threats, defendant was put in such a state of anger, rage, resentment, or terror as in a person of ordinary temper was sufficient to render the mind incapable of cool reflection, then there was adequate cause for the killing, and it would be of no higher degree than manslaughter.   Such facts might have been insufficient to satisfy the jury that defendant acted in self-defense, and yet amply sufficient to warrant them in finding manslaughter."

In Miles v. The State, 18 Texas Court of Appeals, 170, it is said: "While it is true that the provocation must arise at the time of the commission of the offense, and a passion must not be the result of a former provocation, yet in passing upon the sufficiency of the provocation, and on the effects of the passion upon the mind of the defendant, the past conduct of the deceased toward the defendant, his threats and bearing, in fact all the facts and circumstances in the case, should be considered by the jury.   An act standing alone may not be a sufficient provocation, but may be ample when it is one of a series of similar acts, or when it has been preceded by an insolent and aggravated course of conduct, whether similar or not to the acts committed at the time of the homicide."

Now, in the case at bar, it can not be doubted that had the defendant been armed during the afternoon, and had shot and killed deceased while the latter was assaulting and abusing and maltreating him, the

homicide would have been of no greater degree than manslaughter. It must be noted that the deceased did not desist from his insolent, violent, and aggravating conduct, but he was forced to desist by others, and was carried away. If the evidence of the defense is to be credited, the deceased, on the first meeting with defendant after night, used language and threats and made demonstrations tending to show that he was about to renew his former provocations. Under the settled rules established and announced in the cases cited, we are clearly of the opinion that the evidence presented the issue of manslaughter, and that it was fundamental error to omit to submit that issue to the jury, to be determined by them under all the facts and circumstances.

Upon the subject of self-defense the court charged, "that the killing would not be justifiable by self-defense if the apprehended danger of serious bodily harm or death could have been prevented by the use of less violence than taking the life of the deceased." Under repeated decisions of this court, this charge is erroneous. When the accused acts under such an apprehended danger, he is not bound to retreat nor to resort to other means of averting such danger, but may slay his adversary if the danger be imminent and pressing, or if it reasonably appears to be to the accused.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Judges all present and concurring.