THE STATE v. HUDSPETH, Appellant.

Division Two, May 23, 1899.

1. **Indictment**: CONCLUSION: TIME AND PLACE.  It is not necessary to restate in the conclusion of an indictment the time and place of the commission of the offense.

———: GRAND JURY: CHALLENGING ARRAY.  The challenge of a grand juror must be made before he is sworn, and if made then can be sustained only on one of two grounds, namely, either that he is prosecutor or complainant, or that he is a witness on the part of the prosecution and has been summoned or bound in a recognizance as such.

3. **Criminal Law**: CHANGE OF VENUE: PRIMA FACIE CASE.  Before defendant is entitled to a change of venue on account of the prejudice of the inhabitants of the county, his evidence must be sufficient to establish a *prima facie* case of prejudice, and unless he does this, although no attempt at impeachment of his witnesses is made, and no rebuttal evidence is offered by the State, it is no abuse of the discretion of the trial judge to deny the change.

4. **Homicide**: STATEMENT OF DECEASED: RES GESTAE.    The statement of deceased, made to his wife or a young woman companion immediately after the shooting and as soon as they reached him, that "if you had not taken that gun away from me it would have been different," is held, under the circumstances of this case, to be a part of the *res gestae,* and should have been admitted in evidence.

5. ———: NO DENIAL BY DEFENDANT: INSTRUCTION.    This instruction was given: "The court instructs the jury that if you believe any statements of the defendant have been proven by the State and not denied by the defendant, they are taken as true."    *Held* to be error. The defendant is presumed to be innocent, and no presumption of the truth of the evidence against him arises because he refuses to deny it. Besides, this instruction invades the rights of the jury, whose province it is to decide upon the credibility of the testimony.

6. ———: ———: PLEA OF NOT GUILTY.    The plea of not guilty puts to the test of the jury all the evidence against the defendant, and the presumption of innocence protects him until the jury, not the court, shall find him guilty beyond a reasonable doubt.

7. ———: APPREHENDED DANGER: INSTRUCTION.    Defendant went to deceased and denied that he had written an anonymous letter to defendant's aunt, warning her of the attentions of deceased to his cousin.    Deceased denounced him as a liar and avowed his purpose to get his gun and kill him.    Soon afterwards he was seen with his gun, swearing he would kill defendant.    His wife and the cousin took the gun from him.    An hour or two later defendant hitched his horse in front of a store and sat down on a block, and deceased a little later approached the store, cursing and threatening, and defendant arose and asked him if he had his gun.    Deceased cursed him, told him he was not afraid of him, hurriedly entered the store, got two scale weights, came out cursing and threatening defendant, and there was evidence that he was in the act of throwing a weight at defendant when defendant shot him.    *Held,* under these circumstances, that the defendant, being without fault, had a right to act upon appearances, and to defend his life, and was not required to flee from the public highway in which he had been assailed, *and,* hence, the court erred in including these words in the instruction on self-defense: "But to justify the defendant on the ground of self-defense the apprehended danger must have been apparent, impending, and one from which it must have reasonably appeared to the defendant that he could not escape otherwise than by firing the fatal shot.    If it reasonably appeared to defendant that he could escaped the apprehended danger otherwise than by shooting deceased, then it was his duty to have done so and he can not be justified on the ground of self-defense."

8. ———: EFFORTS AT PEACE: RES GESTAE. It is no part of the *res gestae* that the defendant on the morning of the homicide put a boy on a horse and sent him to a mutual friend with a request that he come to the town and make peace between him and the deceased, the deceased not being advised of his action.

9. ———: RES GESTAE: ANONYMOUS LETTER: VISITS OF DECEASED. If the visits of deceased to the store of defendant's cousin was the occasion of the writing of an anonymous letter about her and deceased, and defendant denied that he wrote that letter, it was not error to exclude all evidence concerning the visits of deceased to the store.

10. ———: JURY: ANNOUNCEMENT OF CHALLENGES. An announcement of the State's challenges of jurors, ten minutes before the trial, in a matter in which the defendant is on trial for his life, violates the spirit of the statute, and does not give defendant a reasonable time in which to make his challenges.

11. ———: PROVOCATION: OPPROBRIOUS WORDS. Under the evidence in this case the court properly instructed the jury that mere words alone, however opprobrious and insulting, could not justify defendant in killing deceased.

*Appeal from Jackson County Criminal Court.*—HON. D. W. SHACKLEFORD, Judge.

REVERSED AND REMANDED.

B. L. WOODSON, J. N. SOUTHERN, A. N. ADAMS and WALLACE & WALLACE for appellant.

(1) The court erred in refusing to grant defendant a change of venue. Constitution, art. II, sec. 22; R. S. 1889, section 4156 as amended by the legislature in 1895. State v. Guy, 69 Mo. 430; State v. Hunt, 91 Mo. 490; State v. Loe, 98 Mo. 609; State v. Wilson, 85 Mo. 134; State v. Holcomb, 86 Mo. 371; State v. Dyer, 139 Mo. 199, and State v. Whitton, 68 Mo. 91, in which the rule is laid down that the denial of a change of venue by the trial court will not be disturbed except in a case of abuse of judicial discretionary, are all cases in which evidence was introduced both on behalf of the defendant and the State. We submit that a far different question arises

where the defendant introduces a large number of witnesses in support of his application and the State introduces no evidence in rebuttal.    State v. Goddard, 146 Mo. 177; State v. Tatlow, 136 Mo. 678; Higgins v. Com., 94 Ky. 54; Ex parte Chase, 43 Ala. 303; People v. Yoacum, 53 Cal. 566; Birdsong v. State, 47 Ala. 74; State v. Burgess, 78 Mo. 234.    (2)    The declarations of deceased made immediately after the shooting were a part of the *res gestae* and the court erred in excluding them.    State v. Sloan, 47 Mo. 604; Brownell v. Railroad, 47 Mo. 239; State v. Martin, 124 Mo. 514; 1 Whart. on Evidence, sec. 259; Hunter v. State, 40 N. J. L. 495; Com. v. Werntz, 161 Pa. St. 591; Com. v. M'Pike, 3 Cush. 181; Ins. Co. v. Mosely, 8 Wall. 397; Ins. Co. v. Hillmon, 145 U. S. 296; Entwhistle v. Feighner, 60 Mo. 214; Harriman v. Stowe, 57 Mo. 93; Com. v. Hackett, 2 Allen, 136; Crookham v. State, 5 W. Va. 511; Hill's case, 2 Gratt, 594.    (3)    The court erred in giving instruction numbered 12 over the objection of the defendant.    This instruction is as follows:    "The court instructs the jury that if you believe any statements of the defendant have been proven by the State and not denied by the defendant they are taken as true."    We are aware that beginning with State v. Music, 101 Mo. 271, there is a line of decisions in which this court by way of argument in passing upon the probative force of certain testimony, announces the doctrine contained in the above instruction.    We refer to State v. Music, above named; State v. Taylor, 134 Mo. 148; State v. Patrick, 107 Mo. 179; State v. Patterson, 116 Mo. 512; State v. Good, 132 Mo. 125; State v. Paxton, 126 Mo. 514, and State v. Albright, 144 Mo. 595.    We are all the more convinced that the doctrine of the above instruction is announced in these cases merely by way of argument, for the reason that no text book is anywhere, so far as we remember, cited sustaining the doctrine, and but two cases from other States cited, namely, 21 N. Y. 578, and 14 Neb. 209.    We most respectfully and urgently call the attention of the court

to the above line of decisions in the sincere belief that after its attention has been called to the evil consequences of this doctrine, when submitted to a jury in the form of an instruction, it will at least so far modify or limit the doctrine as to hold that it is manifest error to submit it to a jury in that form of an instruction. (4) The court erred in refusing instruction "A" as asked by defendant and giving instruction 6 which was instruction "A" as modified and added to by the court. This instruction as modified, in effect told the jury that if defendant could safely have avoided the shooting by fleeing from deceased then it was his duty to flee, and that if he failed to do so there was no self-defense in his case. This is not the law. People v. Newcomer, 118 Cal. 263; LaRue v. State, 41 S. W. 53; Dorsey v. State, 18 So. 199; Beard v. U. S., 158 U. S. 550; Page v. State, 40 N. E. 745; Williams v. State, 17 S. W. 1071; Baltrip v. State, 17 S. W. 1106; Burgess v. Terr, 19 P. 558; State v. Sherman, 18 A. 1040; State v. West, 45 La. Ann. 14; State v. Evans, 33 W. Va. 417; People v. Gonzales, 12 P. 783; Tweedy v. State, 5 Ia. 433; 1 Wharton Crim. Law (9 Ed.), sec. 9; State v. Partlow, 90 Mo. 608. (5) The court erred in excluding testimony to the effect that during the progress of the difficulty between deceased and defendant and while deceased had in his possession the double-barrel shotgun in plain view of defendant threatening to kill him with the same and trying to get loose from his wife and others, defendant sent the boy, Marlow, on his own horse to a mutual friend living a short distance away, with the request to said mutual friend to come to Lake City and make peace between deceased and himself. It is useless to cite authorities in support of this proposition farther than the text books and decisions already cited as to the law of *res gestae*. This was the strongest point defendant had as negativing the claim of the State that he had brought his gun from his home to Van-Cleave's store with the express purpose of killing the deceased. (6) The court erred in excluding evidence as to the conduct

State v. Hudspeth.

of deceased with reference to Miss Mary Hudspeth, which conduct the evidence showed was undoubtedly the cause of the writing of the anonymous letter which caused the difficulty. Granting that there was evidence tending to show that deceased made an assault upon defendant, and there was such evidence, no stronger motive could be shown for such assault than the fact that he believed that he had been thwarted by an anonymous letter written by the defendant. Of course we do not contend that all the details as to deceased's attentions to Miss Hudspeth should have been gone into, but the fact that he did stay a great deal at her store and that this occasioned the writing of the anonymous letter ought to have been shown. (7) The court erred in refusing to require the prosecuting attorney, previous to the expiration of the twenty-four hours taken by defendant for the purpose of making his challenges, to hand the list of the forty-seven jurors to counsel for defendant with the State's challenges as provided by statute. (8) The indictment in this case is insufficient. The concluding charge in the indictment states neither the time nor the place of the commission of the offense. State v. Myers, 99 Mo. 114; Ex parte Slater, 72 Mo. 102; State v. Pemberton, 30 Mo. 376; Wharton, Crim. Pl. and Prac., sec. 150. (9) Defendant's motion to quash the indictment, on the ground that the grand jury had been improperly and illegally impaneled, should have been sustained. Defendant offered to prove that the names of the special grand jury which indicted defendant were handed to the marshal by the regular judge of the court. This defendant offered to prove by the marshal himself, which offer was denied and exception taken.

Edward C. Crow, Attorney-General, and Sam B. Jeffries, Assistant Attorney-General, for the State.

(1) No error was committed in refusing to grant defendant a change of venue. State v. Dyer, 139 Mo. 199; State v. Hol-

Vol. 150 mo—2

comb, 86 Mo. 376; State v. Gray, 69 Mo. 430; State v. Whilton, 69 Mo. 91. The right to a change of venue, not being a constitutional or common law right, but being of statutory origin, which is to be granted in certain cases and refused in others, should be closely adhered to and strictly construed. (2) The declarations of deceased after the shooting constituted no part of the *res gestae;* and was properly ruled out by the trial court. The authorities cited by defendant are not in point for the reason that in those cases the declarations were made immediately after the fatal shots were fired or were made in *articulo mortis.* In the case cited by appellant, the court held that such declarations, in order to be a part of the *res gestae,* must be made contemporaneous with the event of the crime. The declaration could not have been admitted as a dying declaration for the reason that it was not shown that deceased made it under a sense of immediate dissolution. It, therefore, must be rejected unless it be found to have been made contemporaneous with the event of the crime charged, and unless so made it would constitute no part of the *res gestae.* (3) Instruction numbered 12 given by the court on its own motion is objected to by defendant. No objection can be made to the language employed in the instruction. It tells the jury that they may take as true any statements that have been proven to have been made by the defendant, unless such statements have been denied by him. The doctrine contained therein has been time and again announced in the opinions of this court, and there is no reason why an instruction, based upon such declarations of the court, is not to be upheld. State v. Musick, 101 Mo. 271; State v. Patterson, 116 Mo. 512; State v. Albright, 144 Mo. 595. (4) The right of self-defense being a part of the doctrine of necessity it follows that, in order to justify the taking of life, the one who is assailed must employ all the means within his power, consistent with his safety, to avoid the danger and avert the necessity of killing. Out of this proposition has grown the well settled rule

that where one is assailed he must retreat if he can do so without danger, and thus avoid the necessity of taking life in self-defense. This as a general rule is accepted by the best in authority on the subject. State v. McPherson, 29 Ark. 225; State v. Levells, 32 Ark. 585; Com. v. Drum, 58 Pa. St. 9; Holmes v. State, 100 Ala. 80; Goodwin v. State, 102 Ala. 87; State v. Kennedy, 91 N. C. 572; State v. Crane, 95 N. C. 619; State v. Carter, 82 Ala. 13. The right to strike in self-defense does not arise until the person claiming the right has done all in his power to avoid it. State v. Kloss, 117 Mo. 592; State v. Lewis, 118 Mo. 79; State v. Johnson, 76 Mo. 122. A party can not claim justification in taking the life of his assailant on the ground of necessity unless every other remedy has been exhausted. State v. Fahnestock, 23 Ind. 231; People v. Gonzales, 71 Cal. 569; People v. Sawyer, 91 N. Y. 667. (5) Objection is made to the sufficiency of the indictment in that the concluding charge states neither the time nor place of the commission of the offense. The objection is not well founded. The cases of State v. Meyers, 99 Mo. 114, and Ex parte Slater, 72 Mo. 102, cited by defendant, are not in point.

GANTT, P. J.—At the September term, 1897, the defendant was indicted for the murder of Joseph W. Kesner in Jackson county, Missouri, on the 17th day of May, 1897.

He was duly arraigned and entered his plea of not guilty.

The cause was tried in Kansas City in June, 1898, and resulted in a verdict of guilty of murder in the second degree. From the sentence on that conviction defendant appeals. Various errors are assigned.

I. The indictment, omitting the formal caption, is as follows:

The grand jurors for the State of Missouri, in and for the body of the county of Jackson upon their oath present that J. Lamertine Hudspeth whose christian name in full is unknown to these jurors, late of the county aforesaid, on the 14th day of

May, 1897, at the county of Jackson, State of Missouri, then and there being in and upon one Josiah W. Kesner, then and there being, feloniously, willfully, deliberately,. premeditatedly, on purpose and of his malice aforethought, did make an assault, and with a dangerous and deadly weapon, to wit, a certain double-barrel shot-gun, then and there loaded with gunpowder and leaden balls; which he, the said J. Lamertine Hudspeth, in both his hands then and there held at and against him, the said Josiah W. Kesner, then and there feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought did shoot off and discharge and with the double-barrel shot gun aforesaid, and with the gunpowder and leaden balls aforesaid, then and there feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought, did shoot and strike him, the said Josiah W. Kesner, in and upon the head and neck of him, the said Josiah W. Kesner, then and there with the dangerous and deadly weapon, to wit, the double-barrel shot-gun aforesaid and the gunpowder and leaden balls aforesaid, giving to him, the said Josiah W. Kesner, in and upon the head and neck of him, the said Josiah W. Kesner, one mortal wound, of which mortal wound aforesaid, he, the said Josiah W. Kesner, from the fourteenth day of May, A. D. 1897, until the seventeenth day of May, A. D. 1897, in the county of Jackson and State of Missouri, did languish and languishing did live, on which said seventeenth day of May, A. D. 1897, the said Josiah W. Kesner, in the county of Jackson and State of Missouri, of the mortal wound aforesaid, died.

"And so the grand jurors aforesaid, upon their oath aforesaid, do say that the said J. Lamertine Hudspeth him, the said Josiah W. Kesner, in the manner and by the means aforesaid, feloniously, willfully, deliberately, premeditatedly, on purpose. and of his malice aforethought, did kill and murder, against the peace and dignity of the State."

This indictment is challenged on two grounds.

The first objection relates to the form of the conclusion, because it states neither the time nor the place of the commission of the offense.

The point is not well taken. It was not essential to restate the time or the place in the conclusion. That is not the office of a conclusion.

The time and place having been already stated, says Chitty in his Criminal Law, 3d Vol. *737, "the indictment must draw the conclusion that so the prisoner, the defendant, feloniously, etc., did kill and murder." The form used in this case is the same approved in Heydon's Case, 4 Coke, 41b. [3 Chitty's Crim. Law, 750; Wharton on Homicide, sec. 849; Rex v. Nicholas, 7 C. & P. 538.]

The case of State v. Meyers, 99 Mo. 107, does not support the contention of counsel. The defect in that indictment was the failure to charge that *so the grand jurors upon their oath do say that the said"* etc. The omission of the italicized words was the error in that case, and not the failure to allege either time or place.

The indictment is also attacked because it is alleged that the names of the special grand jury which indicted defendant, were handed to the marshal by the regular judge of the criminal court. This was one of the grounds in the motion to quash. This is in fact an attempt to challenge the array. By positive enactment the legislature has limited this right to the instances enumerated in section 4067, R. S. 1889. It is provided in said section that the competency of a grand juror may be challenged before he is sworn, on one of two grounds, either that he is prosecutor or complainant, or that he is a witness on the part of the prosecution and has been summoned or bound in a recognizance as such. It follows that the objection coming after the finding of the indictment was too late, and if seasonable was not one which the law would recognize. No error was committed in overruling the motion to quash as to this ground. [State v. Holcomb, 86 Mo. 371.]

II.   Proceeding in the natural order we must next determine whether error was committed in denying defendant a change of venue.   The present statute governing changes of venue has been so recently reviewed in this court in State v. Goddard, 146 Mo. 177, that it is deemed unnecessary to repeat at length what was said in that case.

We still hold that where the defendant in addition to his own affidavit and that of two supporting witnesses, makes out a *prima facie* case of prejudice of the inhabitants of the county against him, and his witnesses are not impeached either by cross-examination or by evidence *aliunde* or direct impeachment of their veracity, and the State offers no rebuttal, he is entitled to a change of venue.

That case is invoked to reverse the trial court in this case. Each of these applications depends upon the peculiar facts developed.   It has been uniformly held that the trial judges have peculiar advantages in weighing the evidence in these cases and their findings are not to be interfered with unless it appears they have abused their discretion.

In Goddard's case we came to the conclusion that the change ought to have been granted.   The evidence of prejudice was very strong and covered all portions of the county. We can not agree with counsel that as strong a showing has been made in this case, as in that.   A short resume of the testimony will form a more satisfactory basis for our opinion than mere deductions.   P. J. Jones, a former judge of the county court, testified he lived at Independence, and did not think defendant could get a fair trial.   When questioned as to the persons who had expressed a prejudice he said he wouldn't like to.   They were kinsfolk of defendant, and as many as three neighbors.   These persons didn't think defendant was getting a fair chance over at Kansas City.   They had no prejudice against defendant.   No people who would be jurors had expressed any prejudice in his hearing against defendant.

State v. Hudspeth.

Frank Graham, managing editor of the World newspaper, simply testified to the daily circulation of about 1,800 papers in Jackson county. T. W. Smith, employed on the Kansas City Star, testified to a circulation of about 42,500 daily in Jackson county. These two witnesses also identified clippings from said papers commenting on the homicide of Kesner.

W. H. Moore, who had lived 40 years in Independence, was inclined to think there was prejudice against defendant. Had heard half dozen people discuss the case. Some said one thing, some another. Some thought it would be a little hard for him to get a fair trial, others thought he could get as fair a trial in Jackson county as anywhere else. There were ten thousand people in Independence. Couldn't say that those who expressed themselves against Hudspeth outnumbered those who favored him.

Martin Gossett, clothing merchant in Kansas City. Very well acquainted in the city and county. Could only speak as to prejudice from remarks heard in his store. These parties said that if what the newspapers said was true he ought to be hung. Heard this several times shortly after the homicide occurred. Had heard only one man speak about it in six months.

John M. Surface. Lives in Kansas City. Drug and paint business. Knew defendant well. Kept the newspapers for sale. The people who came to trade were nearly all against defendant, at that time. Has been very little said recently. He sold about 20 to 30 papers daily. Has heard very little about the matter for six months. Nothing in the newspapers for six months.

Mell Hulse lived in Jackson county 51 years. Had been city marshal of Independence for 11 years and connected with marshal's office in Kansas City. Had heard this case discussed considerably, and the sentiment seemed to be against the defendant. Had heard the people at Independence and eastern part of the county discuss it, but not in the last three

or four months.   Some thought he ought to be hung.   Some thought he ought to go to the penitentiary.

Benjamin Holmes.   Lived in Kansas City.   Had been city treasurer and mayor.   Engaged now in live stock business. Had heard quite a number express themselves at the stock yards.   Some thought he ought to be hung.   Some thought he was innocent, and should be discharged.   Some thought he ought to be tried by the court.   Hadn't heard it discussed recently except when the trial was mentioned.   Most of those he heard speak about it in the city were against him.

Capt. Parker of the police had been on the force 15 years. Had heard case discussed considerably.   In his opinion there was a prejudice against defendant.   Had charge of the station and people would be coming in there all the time.   Some would be against defendant.   With the exception of one man he hadn't heard anything for three or four months.   They would say if what the newspapers say is so he ought to be hung.   His district covered a large part of the city.

George Shawhan testified that he had lived in Kansas City since 1872.   Had heard the matter discussed some little. Some he talked with seemed to be prejudiced from the news-paper reports.   People that knew the facts were not pre-judiced.

H. C. Chiles lived in Independence.   Knew defendant well.   The majority he heard talk were against defendant. Hadn't seen many friendly to him.   People thought from newspaper reports defendant was getting witnesses to leave the State.

A. G. Williams thought the opinion generally at first was that the case against defendant was weak, later on the news-papers created a feeling against him.   Hadn't heard it talked of except in a moderate way for several months.   He had heard the talk in Kansas City, Independence and Blue Springs.   The majority of the people were favorable to him at the start.   Don't know what caused a change unless it was the indictment or newspapers.

Joseph Clifton, barkeeper, had heard the case discussed at the bar and on the street, and people said if this man killed this man as they say he did, he ought to be hung.

Various newspaper clippings from the Star and World, newspapers, giving various versions of the homicide, criticising the courts, grand jurors and jurors generally, were read, a practice well designed to promote changes of venue. We have carefully considered them and find they are not materially different from the usual comments in such cases.

Is it plain that the trial judge who saw these witnesses erred in denying the change? It must be borne in mind that of the twelve witnesses who were called, Messrs. Graham and Smith simply identified the newspaper clippings and testified to the circulation of their newspapers. Judge Jones not only failed to prove any prejudice against defendant but a strong sentiment in his favor. Mr. Moore's testimony disclosed that as many of those whom he heard discuss the case and they did not exceed a dozen in a city of ten thousand people, thought defendant could get a fair trial in Jackson county and the others thought it would be a little hard for him to do so. Mr. Gossett could only speak from what parties who traded with him said, and their opinions were contingent upon the truth of the newspaper accounts, and for six months he had heard nothing. Surface sold twenty or thirty newspapers a day and nearly all his patrons were against defendant soon after the homicide, but he had heard very little about the case recently, and had seen nothing in the newspapers for six months. Hulse had been marshal of Independence for 11 years and testified the sentiment seemed to be against defendant in Independence and the eastern part of the county. Ex-Mayor Holmes's evidence showed about a stand-off. One half thought defendant was innocent, the other half thought he was guilty. Captain Parker testified to statements showing a conditional opinion to wit, that if the newspapers told the facts he ought to be punished. Williams thought the opinion was largely in favor of

defendant at first, but had changed some since the indictment. Mr. Chiles thought the majority were against defendant; that is to say, that he was guilty. In a word, outside of three or four witnesses the evidence tended to show a well divided sentiment as to defendant's guilt or innocence. The remainder had opinions that he was guilty contingent upon the truth of the newspaper articles. These articles were . editorial and reportorial comments and did not contain any evidence.

After mature consideration we are not of opinion that this evidence made out a plain *prima facie* case of prejudice such as would deprive defendant of a fair trial. Considering that Jackson county has a population of over two hundred thousand people, and the further fact that outside of Kansas City and Independence no adverse criticisms were shown, and there are seven other townships, we think the circuit judge properly decided as he did, and his decision should not be disturbed without much more cogent proof than the record discloses.

III. It is earnestly urged by defendant that the circuit court erroneously excluded the statement made by deceased to his wife or Miss Hudspeth immediately after the shooting and while he was yet lying in the doorway of Van Cleave's store, that "if you had not taken that gun away from me it would have been different." Exception was duly saved to this ruling at the time.

In this connection it should be observed that the other testimony disclosed that just after a previous altercation on that morning between deceased and defendant, deceased had a double-barrel shotgun in his hands and was loudly asserting he would kill defendant as soon as he could get some shells for his gun; that his wife and Miss Hudspeth succeeded in getting the gun from him; that Mr. Carr came to the house of deceased to get him to go down to the office to get a money order; that he went, and that defendant and deceased had another wordy altercation, and deceased went into Van Cleave's store

and took up two scale weights and came out of the door with a weight in each hand, and began cursing defendant, and there was testimony that deceased was in a throwing attitude when defendant shot him.

Carr who was standing inside the store went immediately for Kettle, the blacksmith, who was at the shop just in the rear of the store. Kettle came at once, and just as he got there which would have not been more than two minutes after he heard the report of the gun, he heard deceased say to Mrs. Kesner or Miss Hudspeth, "if you had not taken the gun from me it would have been different." Was this statement a part of the *res gestae?*

"The *res gestae,*" says Dr. WHARTON, "may be defined as those circumstances which are the automatic and undesigned incidents of a particular litigated act, and which are admissible when illustrative of such act. These incidents may be separated from the act by a lapse of time more or less appreciable. They may consist, as we will see, of sayings and doings of any one absorbed in the event, whether participant or bystander; they may comprise things left undone as well as things done. . . . . . In other words, they must stand in immediate causal relation to the act, a relation not broken by the interposition of voluntary individual wariness, seeking to manufacture evidence for itself." [1 Whart. Law of Ev., sec. 259.]

In State v. Sloan, 47 Mo. 604, the defendant offered to prove that, whilst the surgeons were dressing the wounds of Moore for whose murder he was being tried, Moore immediately after the shooting took place, in speaking about the matter said that "Sloan was not in fault, that he had drawn on the difficulty by attacking him and that if his pistol had not hung when he went to draw it he would have killed him." The circuit court rejected that statement, but this court reversed the ruling and held it admissible. That this statement of the deceased to his wife or Miss Hudspeth made immediately upon

their reaching him as he was lying where he fell and relating to facts that had so recently occurred within the knowledge of both was illustrative of the result they saw and he felt can not be doubted. From it the jury might have drawn one of two inferences, either that "it would have been different" if he had retained his gun, in that he would have executed his threat of the morning and have killed defendant instead of being shot by him, or, as contended by the Attorney-General, he would have defended himself from the assault of defendant. But whatever the inference, it was one which the jury in weighing all the complicated facts should have been permitted to draw, and in our opinion it was a part of the *res gestae*, an undesigned incident of the homicide which the jury were considering, and the circuit court erred in excluding it.

IV. The court over the objection and exception of defendant, gave the following instruction numbered 12: "The court instructs the jury that if you believe any statements of the defendant have been proven by the State and not denied by the defendant, they are taken as true."

That this instruction violates the fundamental principles of a criminal prosecution, we think is apparent.

In every criminal trial at the common law the burden of proof is upon the State to establish all the essential elements of the crime charged in the indictment beyond a reasonable doubt. An invariable concomitant of this rule is the presumption of innocence which accompanies and abides with the defendant until his guilt is established beyond a reasonable doubt. The accused is not called upon to establish his innocence, but the burden rests upon the State throughout the trial to prove his guilt and never shifts to the defendant. That this instruction required the accused to take the stand and deny the several statements of the witnesses against him, is too plain for argument. That in so doing it violated the settled law of the State is equally undeniable. No such obligation rested upon him. He had a perfect right to set still and decline to testify

at all and no presumption of the truth of the evidence against him would arise from his failure to do so and his failure to do so and his silence would not authorize or justify the court in instructing the jury that as a matter of law his failure to deny the evidence against him raised a presumption that such evidence was true.

By this instruction the court invaded the province of the jury and decided for them the weight of the evidence and the the credibility of the witnesses, whereas under our Constitution and laws it is the exclusive right and duty of the jury to pass upon the witnesses and the weight of testimony. If this instruction be law, then the jury may be required to accept that as truth which under their oaths they may believe to be falsehood.

It was the maxim of the common law, "that with respect to the question of law the jury must not respond, but only the judges, and as to questions of fact, the judges must not respond, but only the jury." [Broom's Legal Maxims (8 Ed.), 101; Coke, Litt. 295b.] In Rex v. Poole, Hardw. by Lee, star p. 28, it was said by Lord HARDWICKE: "It is of the greatest consequence to the law of England and to the subject, that these powers of the judge and the jury be kept distinct; that the judge determines the law, and the jury the facts; and if ever they come to be confounded, it will prove the confusion and destruction of the law of England."

The right of trial by jury in criminal cases is justly regarded of inestimable value, and is imbedded in our Constitution. That there are presumptions of law which the court may properly call to the attention of the jury may be conceded, but nowhere at the common law or under our system in Missouri, is there a presumption that any witness has testified truthfully, nor that his evidence must be accepted as true merely because the accused does not take the witness stand and deny the evidence against him categorically. The plea of not guilty puts to the test of the jury all the evidence against the

defendant, and the presumption of innocence protects him until the jury, not the court, shall find him guilty beyond a reasonable doubt.

This presumption of innocence is axiomatic and elementary. Mr. Justice WHITE, in United States v. Coffin, 156 U. S. 432, traces the origin of this principle of criminal law. He demonstrates beyond all cavil that this presumption of innocence is entirely distinct from the doctrine of reasonable doubt. GREENLEAF lays it down that this presumption is to be regarded by the jury as matter of evidence to the benefit of which the defendant is entitled.     [1 Greenleaf, Ev., sec. 34.] BEST declares it a *presumptio juris*.     Whereas reasonable doubt is the result of the proof or failure thereof, and is in no sense evidence.

That this instruction obliterated the presumption of innocence and cast upon the defendant the burden of proving his innocence by overturning the evidence adduced against him, is perfectly evident.

An illustration by Mr. Justice WHITE demonstrates the antiquity of the presumption and the necessity of the proof beyond a reasonable doubt.     Ammianus Marcellinus relates an anecdote of the Emperor Julian.     Numerius the Governor of Narbonensis, was on trial before the emperor and contrary to the usage in criminal cases the trial was public.     Numerinus contented himself with denying his guilt, and there was not sufficient proof against him.     His adversary Delphidius, "a passionate man," seeing that the failure of the accusation was inevitable, could not restrain himself, and exclaimed, "Oh, illustrious Caesar, if it is sufficient to deny, what hereafter will become of the guilty?"   .  To which Julian replied, "If it is sufficient to accuse, what will become of the innocent?"

It is true that under our statutes a defendant in a criminal case may testify but the statute itself safeguards him against an instruction like this. Sections 4218 and 4219, R. S. 1889. The

statute in conferring the privilege of testifying expressly provides "that no person on trial or examination nor wife or husband of such person shall be required to testify, but any such person may at the option of defendant testify in his behalf or on behalf of a codefendant, and shall be liable to cross-examination as to any matter referred to in his examination in chief." He can not be required to testify directly or indirectly and his cross-examination is restricted to matters about which he has been examined in chief. It is expressly provided that his failure to testify shall not be construed to affect his innocence or guilt, nor raise any presumption of guilt, nor be commented upon, or referred to by any attorney in the case, or considered by the court or jury.

And yet it requires no argument to demonstrate that this instruction says to the defendant,   You must take the stand, and refute the evidence of the witnesses against you, or the court will instruct the jury that your failure to do so raises an absolute presumption of the truth of their testimony. Such an instruction is a palpable violation of the spirit and language of section 4219.

Numerous cases are to be found in our reports in which we have reversed causes for the infraction of this right of the accused under this section and the cross-examination of defendants on matter not included in their direct evidence. [State v. Porter, 75 Mo. 171; State v. Palmer, 88 Mo. 568; State v. McGraw, 74 Mo. 573; State v. Graves, 95 Mo. 510; State v. Brooks, 92 Mo. 542.]

But we are confronted with the fact that beginning with State v. Musick, 101 Mo. loc. cit. 271, this court has said upon appeal that where various statements of the defendant have been given in evidence and he has subsequently gone on the witness stand and testified and failed to deny the making of such statements, they are to be taken as admitted by him. It is true that *arguendo* as to the propriety of giving instructions as to the grade of offense, and as to the sufficiency of the

evidence in several cases to sustain the verdict, this court did use such language, but in no case has this court or any other appellate court within our knowledge or research ever sustained such language in an instruction to a jury. This court long ago cautioned trial courts against the practice of embodying passages taken from a general discussion by this court in instructions to the jury. [Hurt v. Railroad, 94 Mo. loc. cit. 263.] The duty of an appellate court in reviewing a case is very different from that of a jury.

The instruction is erroneous and constitutes reversible error.

V. Error is also predicated upon the action of the court, in refusing instruction "A" of defendant, and giving instruction numbered 6 for the State.

The portion of this instruction to which defendant objects is found in these words added by the court to the usual instruction on self-defense: "But to justify the defendant on the ground of self-defense the apprehended danger must have been apparent, impending, and one from which it must have reasonably appeared to the defendant that he could not escape otherwise than by firing the fatal shot. If it reasonably appeared to defendant that he could have escaped the apprehended danger otherwise than by shooting the deceased, then it was his duty to have done so and he can not be justified on the ground of self-defense."

The evidence very clearly tended to prove that on the morning of the homicide defendant went to the station of which deceased was in charge as agent, and was heard to say, "Joe, I didn't do it," This was a denial of writing an anonymous letter to Mrs. Hudspeth, defendant's aunt, warning her of the attentions of deceased to Miss Mary Hudspeth. Deceased was heard to denounce defendant as a liar and to say he was going to get his gun and shoot him. He was soon afterward seen with his gun and swearing he would kill defendant. His wife

and Miss Hudspeth took the gun from him. Afterward, about half past ten o'clock that morning, defendant was seen to get off his horse and hitch him and sit down on a block in the street in front of Van Cleave's store. After a while deceased and a man named Carr came down to Van Cleave's store. As they approached defendant arose and asked deceased if he had got his gun and told Carr to stand aside. Deceased cursed defendant and told him he was not afraid of him and hurriedly went into Van Cleave's store, took two scale weights off of the counter, and came out on the small porch in front, and renewed the quarrel by cursing and threatening defendant. There was evidence that he was in the act of throwing a weight at defendant when defendant shot him. The question now arising is this, was defendant required to attempt to flee from deceased before he could avail himself of the plea of self-defense.

In State v. Evans, 124 Mo. 397, this court ruled that when one expected another to assault him he had a right to arm himself, and so long as he was where he had a right to be, and did no overt act, and made no hostile demonstrations, he did not lose his right of self-defense if he was assaulted and about to be killed, or suffer great bodily harm. That he was not required to leave the public highway or his own premises because he was threatened.

In this case defendant's life had been threatened on that morning. Deceased had refused to accept his disclaimer of the letter, but had denounced him as a liar and told him he would kill him. He did get his gun, and was heard to swear he would kill defendant. Under these circumstances defendant armed himself and was sitting in front of Van Cleave's store. When deceased again approached him he was armed, whereupon deceased again cursed him, and suiting his action to his words, went into Van Cleave's store and emerged armed with two scale weights, and began to curse defendant and according to

some of the evidence was in the attitude of throwing one of these weights at defendant, who stood only about ten or fifteen feet distant. Under such circumstances, we think the defendant, being without fault himself, had a right if attacked in such a manner as to furnish reasonable ground for apprehending a design to take his life or do him great bodily harm, to act upon appearances, and to defend his life and was not required·to flee from the public highway in which he had been assailed. Hence the qualification to the instruction should not have been given, and was erroneous. We find abundant authority to support our position. [People v. Newcomer, 118 Cal 263; LaRue v. State, 41 S. W. Rep. (Ark.) 53; Beard v. U. S., 158 U. S. 550; Page v. State, 40 N. E. (Ind.) 745; Williams v. State, 17 S. W. Rep. 1071; Baltrip v. State, 17 S. W. Rep. 1106; State v. Sherman, 18 Atl. Rep. 1040; State v. Evans, 33 W. Va..417; Bohannon v. Com., 8 Bush. (Ky.) 481.]

VI.   Another contention of the.defendant is that during the morning and after the first altercation between himself and deceased, he put a boy on his horse and sent him to the house of a mutual friend with the request to this friend to come to Lake City and make peace between deceased and himself.

After careful consideration we are of the opinion that this was no part of the res gestae.

It is not claimed that Kesner was advised of this action, and it did not in the least affect defendant's right of self-defense, which was based, not upon his own efforts to adjust the difficulty, but upon the conduct of deceased in connection with his threats from which defendant might reasonably have apprehended a design to take his life or do him great bodily harm, and that such danger was imminent. This offer was properly denied.

VII.   The court did not err in excluding the evidence offered to show that deceased often visited the store of Miss Hudspeth. This had no tendency to justify the killing of

deceased by defendant. If it was the occasion for the writing of the anonymous letter, still as defendant at all times denied being the author of that letter it afforded him no justification.

VIII. As to the time allowed for making the defendant's challenges, the statute is very plain. The list of jurors who have been found competent shall be delivered to the defendant twenty-four hours before the trial. In all cases the prosecuting attorney is required to first announce the challenges for the State, and then a reasonable time should be given defendant to make his challenges with reference to the action of the prosecution. This must be confided largely to the discretion of the court. Ten minutes in a matter in which the defendant is on trial for his life is utterly inadequate, and violates the spirit of the statute.

IX. The court instructed on murder in the first degree, murder in the second degree and manslaughter in the fourth degree. There was no error in instructing the jury under the evidence in this case, that mere words alone, however opprobrious or insulting, could not justify defendant in killing deceased. Opprobrious epithets under some circumstances may be left to the jury to determine whether they constitute a reasonable provocation to reduce a homicide from murder in the first degree to the second degree and from murder to manslaughter, and such expressions coupled with an otherwise insufficient assault may produce the provocation which reduces the offense to manslaughter, but not a protection against all punishment. The court in the other instructions properly instructed on manslaughter as well as other grades of homicide.

X. The instruction asked by defendant and designated "B" was properly refused. There was no evidence tending to support the hypothesis of a withdrawal in good faith from the difficulty, after having brought on the difficulty.

For the errors noted the judgment is reversed and the cause remanded for a new trial.

Sherwood and Burgess, JJ., concur.